Kathy Jo TAYLOR, A Minor, By and Through David S. WALKER, Jr., Attorney at Law as Guardian ad Litem, Plaintiff-Appellant,

v.

James G. LEDBETTER, PH.D., et al., Defendants-Appellees.

No. 85–8354.

United States Court of Appeals, Eleventh Circuit.

June 9, 1987.

Don C. Keenan, David S. Bills, Atlanta, Ga., for plaintiff-appellant.

David C. Will, Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees.

Before RONEY, Chief Judge, GODBOLD, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, and CLARK, Circuit Judges.

HATCHETT, Circuit Judge:

We took this case en banc to determine whether and under what circumstances, if any, a child involuntarily placed in a foster home may successfully bring an action in federal court against the state officials involved in the placement, for injuries sustained while in the foster home. Finding that a child may successfully bring such an action, we affirm in part and reverse in part.

## Facts

In 1982, pursuant to an order of the Gwinnett County Juvenile Court, the child who was the plaintiff in the district court, and who is the appellant here, was taken from the custody of her natural parents and placed with the Gwinnett County Department of Family and Children Services (DFACS).[1] Upon removing the child from the custody of her natural parents, officials and employees of the Georgia Department of Human Resources and DFACS assumed responsibility for the child's custody, supervision, and care. During 1982, the DHR and DFACS officials placed the child in a foster home. While in the foster home the child suffered severe and permanent personal injuries as a result of being "willfully struck, shaken, thrown down, beaten and otherwise severely abused by the foster mother." She remains in a coma as a result of those injuries.

This suit was filed pursuant to 42 U.S.C. § 1983 by the child, through her guardian, against the state and county officials involved in her placement in the foster home.[2] The child alleges that the state and

1. The child was born on February 3, 1980, and at the time of the order was two years old.

2. The defendant appellees are: James G. Ledbetter, Commissioner of the State of Georgia Department of Human Resources; Patricia Johnson, Director, State of Georgia Department of Human Resources' Division of Family and Childrens Services; Frederick B. Webb, Director, Gwinnett County Department of Family and

county officials were grossly negligent and deliberately indifferent to her welfare when deciding to place her, and after placing her, in the foster home. Specifically, she alleges that the officials: (1) failed to thoroughly investigate the fitness of the foster home; (2) knew or should have known the foster parents were unfit to be trusted with her care, custody, and supervision; (3) failed to maintain proper supervision in inspection of the foster home; and (4) failed to obtain complete physical and medical records, or to furnish available records to the foster parents.

The child's complaint states two claims: first, the officials were deliberately indifferent to her rights and, therefore, they are liable under the reasoning employed in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and in *Doe v. New York City Dept. of Social Services*, 649 F.2d 134 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The second claim is that the Georgia statutory foster care scheme creates a legitimate claim of entitlement enforceable in federal court under the holding in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The United States District Court for the Northern District of Georgia dismissed the complaint for failure to state a claim upon which relief could be granted.[3] This court affirmed. *Taylor v. Ledbetter*, 791 F.2d 881 (11th Cir.1986). The full court took the case en banc to determine the *Roth* and *Estelle* issues.

### Discussion

The state and county officials contend that the child's suit was properly dismissed for four reasons: First, they contend that the child's claim is barred by the recent decisions of the Supreme Court in *Daniels*

*v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Second, they contend that the Georgia statutory scheme for child placement and supervision does not create any entitlements to children placed in foster homes. Their third contention is that the allegations in the child's complaint are conclusory, and if not conclusory, are not sufficient to support a due process claim; and their fourth claim is that because the Gwinnett County Juvenile Court made the decision to remove the child from the natural parents they cannot be liable.

The first contention is easily decided. In *Daniels* and *Davidson*, the Supreme Court held that the due process clause is not implicated by the negligent act of an official causing unintended loss or injury to life, liberty, or property. The complaint in this case, however, alleges, in each paragraph, that the officials were "grossly negligent" or "deliberately indifferent." Thus, the complaint is sufficient to overcome either a *Daniels* or *Davidson* bar.

■ We can also easily dispose of the state officials' fourth contention that the action of the Gwinnett County Juvenile Court insulates them from liability. The Gwinnett County Juvenile Court's removal of the child from her natural parents is irrelevant at this point in the proceedings.

Having decided two of the four contentions above, we proceed to a discussion of the *Estelle* (substantive constitutional claim) and the *Roth* claims.

### The Substantive Constitutional Claim

We note that the allegations in the complaint must be taken as true and construed in the light most favorable to the child.

Childrens Services; Sonyonna Stone Danielle, Gwinnett County Department of Family and Childrens Services; Joanne Hoover, Gwinnett County Department of Family and Childrens Services; and W.R. Berry, Gwinnett County Department of Family and Childrens Services.
The foster parents are not parties to this lawsuit. The American Civil Liberties Union Children's Rights Project and the American Civil Liberties Union of Georgia participated as amici curiae.

3. The complaint is drafted in three counts. Count I alleges a violation of the fourteenth amendment under the "entitlement to benefits theory." Count II alleges an eighth and fourteenth amendment violation under the "deliberate indifference theory," and Count III alleges a due process violation for failure to abide by the mandates of federal statutes and regulations.

*Scheuer v. Rhodes,*[4] 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Miller v. Stanmore,* 636 F.2d 986 (5th Cir.1981); *Johnson v. Wells,* 566 F.2d 1016 (5th Cir.1978).

## A. *Section 1983*

■ We address first the requirements for an action filed under 42 U.S.C. § 1983. For a section 1983 action to arise where an official is charged with failing to exercise an affirmative duty, two requirements must be satisfied. First, the failure to act must have been a substantial factor leading to the violation of a constitutionally protected liberty or property interest. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Second, the official having the responsibility to act must display deliberate indifference. *Turpin v. Mailet,* 619 F.2d 196 (1980), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). These two requirements have been adequately pleaded in this case.

## B. *The Liberty Interest*

■ The liberty interest which the child asserts under the fourteenth amendment is a substantive due process right rather than a procedural due process right. In a substantive due process claim, we are concerned with those rights which the state may not take away. Substantive due process rights are rights such as those listed in the Bill of Rights and those rights held to be so fundamental that a state may not take them away. Among the fundamental rights not listed in the Bill of Rights or incorporated through the fourteenth amendment are such rights as abortion (*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)); privacy (*Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); marriage (*Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)); and safety and physical movement (*Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

■ On the other hand, procedural due process claims involve those expectations created by state law. As to these rights, the state may take them away by affording predeprivation hearings as in *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (public employment); or by a post-deprivation hearing as in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (hobby kit), or by providing other safeguards. *Parratt* only applies to procedural due process claims; consequently, *Parratt* is not a bar to this action brought under section 1983 based on the fourteenth amendment.

The liberty interests in this case are the right to be free from the infliction of unnecessary pain, as that interest is protected by the fifth and fourteenth amendments, and the fundamental right to physical safety as protected by the fourteenth amendment.[5]

The Supreme Court recognized a liberty interest in a person involuntarily committed to a custodial setting in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg,* the

---

4. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

'In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief.' *Conley v. Gibson,* 355 US 41, 45–46, 2 LEd2d 80, 78 SCt 99 (1957) (footnote omitted).

416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96–97 (1974).

5. The fourteenth amendment, in relevant part, provides:

SECTION I. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.* [Emphasis added.]

mother of a mentally retarded person involuntarily committed to a Pennsylvania state institution upon her petition filed a complaint pursuant to 42 U.S.C. § 1983 seeking damages against the institution's officials. The mother alleged that the officials knew or should have known that her son was suffering injuries, but failed to take appropriate preventive procedures, thereby violating his rights under the eighth and fourteenth amendments. The Supreme Court recognized the child's liberty interest in the safety of his environment and noted that the right to personal security constitutes a "historic liberty interest" protected substantively by the due process clause. *Youngberg v. Romeo*, 457 U.S. at 315, 102 S.Ct. at 2458, 73 L.Ed.2d at 37 (citing *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)).

The liberty interest in this case is analogous to the liberty interest in *Youngberg.* In both cases, the state involuntarily placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements. In *Youngberg* the Court said, "if it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2458, 73 L.Ed.2d at 37.

■ A child confined to a state mental health facility has a fourteenth amendment substantive due process liberty interest in reasonably safe living conditions. *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28, 39 (1982). Similarly, if foster parents with whom the state places a child injure the child, and that injury results from state action or inaction, a balancing of interests may show a deprivation of liberty.

■ State action was clearly involved in *Youngberg* where the person was confined to a state mental facility. In this case, the child's physical safety was a primary objective in placing the child in the foster home. The state's action in assuming the responsibility of finding and keeping the child in a safe environment placed an obligation on the state to insure the continuing safety of that environment. The state's failure to meet that obligation, as evidenced by the child's injuries, in the absence of overriding societal interests, constituted a deprivation of liberty under the fourteenth amendment.

■ We are mindful that a liberty interest protected by the due process clause involves a balancing. "In determining whether a substantive right protected by the due process clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Youngberg*, 457 U.S. at 320, 102 S.Ct. at 2460, 73 L.Ed.2d at 40. By alleging that the gross negligence and deliberate indifference of state officials rendered her comatose, the child has sufficiently pleaded a liberty interest. The state of Georgia may assert societal reasons for failing to take the actions alleged as necessary in the child's complaint and held mandatory by the Georgia statutory scheme. Whether the child's claim constitutes a liberty interest protected by the due process clause when weighed against the demands of society will be determined at later stages in these proceedings.

### C. *Deliberate Indifference*

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that prison officials who show deliberate indifference to a prisoner's serious illness or injury violate the eighth amendment's prohibition against the infliction of cruel and unusual punishment. Such a transgression gives rise to a prisoner's action under 42 U.S.C. § 1983. This principle is well established in this circuit. *Williams v. Bennett*, 689 F.2d 1370 (11th Cir.1982).

The Second Circuit has held that a minor in state custody may maintain a section 1983 action based on the fourteenth amendment under an *Estelle* analysis. *Doe v. New York City Dept. of Social Services*, 649 F.2d 134 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The *Doe* court held that where a

state official's deliberate indifference is a substantial factor in denying property or liberty interests, a child in foster care is in a situation analogous to a prisoner in state custody. Consequently, state officials responsible for foster placement may be liable under section 1983.

The facts in *Doe* are similar to those in this case. In *Doe,* a foster child sued her legal custodian and a voluntary child welfare agency which provided foster care under a contract with the city of New York. In the suit, the foster child alleged that state officials violated her constitutional rights when, with the knowledge of possible sexual abuse from her foster father, they failed to investigate or remove her from the foster home. The Second Circuit held that government officials may be liable under section 1983 not only for overt activity which is unlawful and harmful, but also for failure to act when the duty to act exists. "When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the Constitution. Thus, nonperformance of such custodial duties has been held to give rise to a section 1983 cause of action for prisoners." *Doe,* 649 F.2d at 141.

Is a foster child involuntarily placed in a foster home in a situation so similar to that of a prisoner involuntarily placed in an institution that similar rules of law should be applied? We believe so. We recognize that the situations are not parallel. Obviously, a closer relationship exists between superior officers, subordinate officers, and the inmates within a prison than exists between a state agency, the foster parents, and the foster child in a foster care setting. In a penal institution, all the persons involved are in close and daily contact. Wardens and supervisors have the ability to daily monitor the activities of subordinates as well as the effect of certain conduct upon inmates. Although the contacts between actors in the foster home situation are not as close as in the penal institution the situations are close enough to be held analogous. The lack of proximity in the foster home situation simply suggests that deliberate indifference is not as easily inferred or shown from a failure to act. A child abused while in foster care, in order to successfully recover from state officials in a section 1983 action, will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home.[6]

Although mindful of the fact that the eighth amendment has historically been limited to criminal proceedings, such substantial similarities exist between a prisoner's situation and the situation of a minor child forced into a foster home that we are justified in holding that the situations are sufficiently analogous to support a section 1983 action. *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) is not a bar to this holding. In finding that imposing corporal punishment upon school children in public schools does not constitute cruel and unusual punishment, the Supreme Court relied heavily upon the support which a school child receives from family, friends, teachers, and other pupils who may witness and protest mistreatment. The Court acknowledged, in its well-known footnote, that some circumstances may be sufficiently analogous to criminal processes as to justify application of the eighth amendment.[7] The Court expressly left open the question of whether

6. The state officials argue that it is not enough that the complaint in this case alleged deliberate indifference to the child's welfare. They contend that the complaint must also allege knowledge and causation on the part of the officials. The complaint in this case clearly alleges knowledge and causation.

7. The footnote states: "Some punishments, though not labeled 'criminal' by the state may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the eighth amendment. *Cf. In Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, 40 Ohio Op.2d 378 (1967). We have no occasion in this case, for example, to consider whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the eighth amendment." 430 U.S. at 669 n. 37, 97 S.Ct. at 1411 n. 37.

and under what circumstances persons involuntarily confined in juvenile institutions may claim eighth amendment protection. In *Ingraham*, the Court discussed the cost of providing additional benefits and safeguards to school children threatened with punishment. It found the cost of benefits and additional safeguards high and the risk of harm to the school children low. In the foster home setting, recent events lead us to believe that the risk of harm to children is high. We believe the risk of harm is great enough to bring foster children under the umbrella of protection afforded by the fourteenth amendment. Children in foster homes, unlike children in public schools, are isolated; no persons outside the home setting are present to witness and report mistreatment. The children are helpless. Without the investigation, supervision, and constant contact required by statute, a child placed in a foster home is at the mercy of the foster parents.

The fourteenth amendment, like the eighth amendment, "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). With contemporary society's outrage at the exposure of defenseless children to gross mistreatment and abuse, it is time that the law give to these defenseless children at least the same protection afforded adults who are imprisoned as a result of their own misdeeds.

We agree with the Second Circuit:

Defendants may be held liable under 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiff's deprivation of rights under the Constitution.

649 F.2d at 145.

■ We hold that a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights.[8]

This holding does not mean that every child in foster care may prevail in a section 1983 action against state officials based on incidental injuries or infrequent acts of abuse; only where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child will liability be imposed.[9]

D. *Special Relationship*

We are not alone in our holding. Other circuits have recognized that special relationships may support section 1983 actions. In *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982), the Seventh Circuit refused to hold the state liable for a murder committed by a schizophrenic (with a history of criminal violence) one year after being released from a state mental hospital. The court in *Bowers* stated that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen." *Bowers*, 686 F.2d at 618. However, the *Bowers* court held that an affirmative duty obligating the state to protect private citizens' safety and health could arise from special custodial or other relationships—where the state is responsible for placing such person in a "position of danger" or potential harm. The court in *Bowers* stated: "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tort feasor as if it had thrown him into a snake pit. It is

---

**8.** The record shows confusion between the parties as to the nature of the child's claims. Additionally, the district court noted in its order that the child probably had a valid *Estelle* claim, but that the child had not argued such a theory. The record indicates that such a theory was advanced early in the case. In any event, the *Estelle* claim was argued before the panel and the en banc court.

**9.** We do not suggest by our holding the inapplicability of principles such as immunity or other defenses.

on this theory that state prison personnel are sometimes held liable under section 1983 for the violence of one prison inmate against another." *Bowers*, 686 F.2d at 618. The *Bowers* court refused to distinguish between custodial relationships and "other relationships created by the state."

The Fourth Circuit in *Fox v. Custis*, 712 F.2d 84, 86 (4th Cir.1983), defined the category of persons entitled to institute a section 1983 claim against the state. The *Fox* court expressly stated the nexus between the state and a private citizen necessary to an action under section 1983:

> With one qualification, we agree with the Seventh Circuit's recent holding that, in general, there simply is 'no constitutional right to be protected by the state against ... criminals or madmen,' and that because, in corollary, there is no 'constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983.' *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). The qualification—an important one actually acknowledged by the *Bowers* court, *Id.* —is that such a right and corollary duty *may* arise out of special custodial or other relationships created or assumed by the state in respect of particular persons. [Original emphasis.]

*Fox*, 712 F.2d at 88.

The liberty interest which the plaintiff alleges is also sufficiently borne out by our decision in *Dollar v. Harralson County*, 704 F.2d 1540 (11th Cir.1983). In *Dollar*, we stated: "In determining whether a constitutional deprivation has occurred, courts must examine whether the defendant was under any obligation to the particular plaintiff. The question of the existence of such a duty is an issue of law." 704 F.2d at 1543. We went on to note that the existence of duties resulting from relationships is usually clear in section 1983 cases, citing the relationship between prisoners and wardens and hospitals and patients.

*Dollar* suggests that the more important the relationship and its attendant duties, the more likely it is that an act or omission on the part of one party has the potential to deprive the other of a constitutional right. The relationship between state officials charged with carrying out a foster child care program and the children in the program is an important one involving substantial duties and, therefore, substantial rights.

This circuit has also recognized the "special relationship" analysis. *Jones v. Phyfer*, 761 F.2d 642 (11th Cir.1985). The *Jones* court, in noting that "[t]here are cases which demonstrate the type of special relationship required for an action under 42 U.S.C. § 1983," stated: "the case workers were hired specifically to protect the children and ... it would therefore be unreasonable to characterize the child's death as too remote a consequence of the case workers' failure to perform their duties." *Jones*, 761 F.2d at 645.

### The *Roth* Claim

The child also contends that the statutes and regulations of the state of Georgia create in her a legitimate and sufficiently vested claim of entitlement such that deprivation of that entitlement without due process of law imposes on her a grievous loss. This claim is based on the Supreme Court's holding in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth*, the Court held that procedural due process applies to the deprivation of interests encompassed within the fourteenth amendment's protection of liberty and property when a person has acquired specific benefits through state law.

We must look to the Georgia statutes and ordinances to determine whether they indicate an intention to bestow benefits upon children in the care of the state or upon children placed by the state in foster homes. An appendix is attached setting forth the statutes and ordinances involved in this case. The district court's order provides an excellent summary of the pertinent Georgia statutes and ordinances:

> The Georgia statute in question provides generally that the Department of Human Resources is authorized to use its facilities for the assistance of children in several ways, including child welfare servic-

es, preventive services, services to courts, and regulation of child placing and child caring agencies. *See* O.C.G.A. § 49–5–8. Moreover, O.C.G.A. § 49–5–9(b) requires that institutions and agencies which have custody of children who are committed to the Department shall be inspected by the Department. The regulations governing foster care services which are those most directly applicable to the present case are found at O.C.G.R.R.G. § 290–2–12–.08. These regulations require the development of a plan for a child placed in foster care which is responsive to the child's needs, is attentive to the duration of the placement, projects necessary medical services, and sets goals toward enabling the child to be replaced with his natural family. Subsection (3) of that section provides that the selection of a foster home should be based upon an assessment of the child's total needs and how well a particular program can meet the child's needs. Subsection (13) provides that the agency shall evaluate each foster home including: motives; adjustment of the foster family to each other and the community; foster family's attitude toward the parents of the foster child; the family's expectations of behavior of foster children; physical standards; community resources; the physical, mental, and emotional health of each member of the foster family; foster parent training; and adequacy of financial resources. *Subsection (16) provides that supervision of children in foster homes is to be maintained by the agency 'through visits made at regular intervals and as frequently as is necessary for the best interest of the child.' The section continues that there must be at least one personal contact each month.* Subsection (19) of the foster child regulations provides that the agency shall maintain a file for each foster child which includes, *inter alia,* the child's medical history and a health record. [Emphasis added.]

In spite of the comprehensive and direct nature of the statutory commands, the district court concluded that the statutes and ordinances only provided "procedural guidelines" to be followed in arriving at decisions. We disagree.

The Georgia statutes provide more than just "procedural guidelines" to be followed in arriving at decisions. The Georgia foster care and placement scheme is a comprehensive one. The Children and Youth Act provides that "legal custody embodies: '(B) the right and the duty to protect [children] ... and (C) the responsibility to provide food, clothing, shelter, education, and ordinary medical care.'" O.C.G.A. § 49–5–3(12). The law governing the licensing of child placement agencies clearly mandates that the Department of Human Resources "in placing children in foster family homes, shall safeguard the welfare of such children by thoroughly investigating each such home and the character and reputation of the persons residing therein and shall adequately supervise each home during the period of care." "... It shall be the duty of the department to inspect at regular intervals all licensed child welfare agencies within the state including ... foster family homes...." O.C.G.A. § 49–5–12(*l*), (m). The regulations governing foster care services are found in O.C.R.R.G. § 290–2–12–08. Subsection 3 of that section provides that the selection of a foster home should be based upon an assessment of the child's total needs and how well a particular program meets the child's needs. Section 16 provides *that supervision of children in foster homes is to be maintained "through visits made at regular intervals and as frequently as necessary for the best interest of the child."* (Emphasis added.)

■ Thus, the Georgia scheme mandates that officials follow guidelines and take affirmative actions to ensure the well being and promote the welfare of children in foster care. These children can state a claim based upon deprivation of a liberty interest in personal safety when the officials fail to follow this mandate. "In a constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558 (1972).

It is of no moment that the state officials are not charged in this case with affirmatively acting to harm this child. What the child is entitled to is the state's protection from harm. She is entitled to be protected in the manner provided by statute. It would be anomalous if the state, in allegedly acting to protect the child, could itself cause harm to the child by failing to assume the child's minimal physical safety. Failing to act may, under certain circumstances, be more detrimental than acting.

We hold that the Georgia child care statutory scheme gives rise to a *Roth*-type claim.[10]

Since the child's claim under *Roth* is a procedural due process claim, the state of Georgia may alter its statutes and ordinances in such a way as to change or eliminate the expectation on which this child had the right to rely.

For the reasons expressed by the district court, we find without merit plaintiff's claim in Count III of the complaint based upon the Social Security Act, 42 U.S.C.A. § 601 and its regulations.

Accordingly, we affirm the district court's dismissal of Count III of the complaint. We reverse and remand the case as to Counts I and II.[11]

AFFIRMED in part, REVERSED in part and REMANDED.

## APPENDIX

O.C.G.A.
49–5–2. Purpose of article.

The purpose of this article is to promote, safeguard, and protect the well-being and general welfare of children and youth of this state through a comprehensive and coordinated program of public child welfare and youth services, providing for:

(1) Social services and facilities for children and youths who require care, control, protection, treatment, or rehabilitation and for the parents of such children;

(2) Setting of standards for social services and facilities for children and youths;

(3) Cooperation with public and voluntary agencies, organizations, and citizen groups in the development and coordination of programs and activities in behalf of children and youth; and

(4) Promotion of community conditions and resources that help parents to discharge their responsibilities for the care, development, and well-being of their children.

It is the further purpose of this article to provide for a qualified group of citizens and leading professionals who will identify and study the problems of youth, recommend and effect possible solutions, and work actively for state and local action to prevent children and youths from becoming inmates of our prisons, patients in our mental hospitals, and persons dependent upon public assistance programs. (Ga.L.1963, p. 81, § 2.)

O.C.G.A.
49–5–3. Definitions.

As used in this article, the term:

(1) "Child-caring institution" means any institution, society, agency, or facility, whether incorporated or not, which either primarily or incidentally provides full-time care for children under 17 years of age outside of their own homes, subject to such exceptions as may be provided in rules and regulations of the board.

(2) "Child-placing agency" means any institution, society, agency, or facility, whether incorporated or not, which places children in foster homes for temporary care or for adoption.

(3) "Child welfare and youth services" means duties and functions authorized or required by this article to be provided by the department with respect to:

(A) Establishment and enforcement of standards for social services and facilities for children and youths which supplement or substitute for parental care

---

**10.** We leave to the district court all determinations regarding the scope of authority and the extent of duties of the appellees.

**11.** Judge Edmondson did not participate in this case.

and supervision for the purpose of preventing or remedying or assisting in the solution of problems which may result in neglect, abuse, exploitation, or delinquency of children and youths;

(B) Protecting and caring for deprived children and youths;

(C) Protecting and promoting the welfare of children of working mothers;

(D) Providing social services to children and youths and their parents and care for children and youths born out of wedlock and their mothers;

(E) Promotion of coordination and co-operation among organizations, agencies, and citizen groups in community planning, organization, development, and implementation of such services; and

(F) Otherwise protecting and promoting the welfare of children and youths, including the strengthening of their homes where possible or, where needed, the provision of adequate care of children and youths away from their homes in foster family homes or day-care or other child-care facilities.

(4) "Day-care center" means any place operated by a person, society, agency, corporation, institution, or group wherein are received for pay for group care for fewer than 24 hours per day without transfer of legal custody 19 or more children under 18 years of age.

(5) "Delinquent child or youth" means any person so adjudged under Chapter 11 of Title 15.

(6) "Detention" or "detention care" means temporary care in a facility affording secure custody.

(7) "Family boarding home" means a home operated by any person who receives therein for pay for supervision, care, lodging, and maintenance, with or without transfer of legal custody, three or more children under 17 years of age who are not related to such person and whose parents or guardians are not residents of the same house.

(8) "Family day-care home" means a private residence operated by any person who receives therein for pay for supervision and care fewer than 24 hours per day, without transfer of legal custody, three but not more than six children under 18 years of age who are not related to such person and whose parents or guardians are not residents in the same private residence.

(9) "Group-care facility" means a place providing care for groups of children and youths, other than a foster family home.

(10) "Homemaker service" means a service provided by a woman selected for her skills in the care of children and home management and placed in a home to help maintain and preserve the family life during the absence or incapacity of the mother.

(11) "In loco parentis" means a quasi-parental relationship inferred from and implied by the fact that a child or youth has been taken into a family and treated like any other member thereof, unless an express contract exists to the contrary.

(12) "Legal custody" means a legal status created by court order embodying the following rights and responsibilities:

(A) The right to have the physical possession of the child or youth;

(B) The right and the duty to protect, train, and discipline him;

(C) The responsibility to provide him with food, clothing, shelter, education, and ordinary medical care; and

(D) The right to determine where and with whom he shall live,

provided that these rights and responsibilities shall be exercised subject to the powers, rights, duties, and responsibilities of the guardian of the person of the child or youth and subject to any residual parental rights and responsibilities.

(13) "Maintenance" means all general expenses for care such as board; shelter; clothing; medical, dental, and hospital care; transportation; and other necessary or incidental expenses.

(14) "Maternity home" means any place in which any person, society, agency, corporation, or facility receives, treats, or cares for, within any six-month period, more than one illegitimately pregnant woman, either before, during, or within two weeks after

childbirth. This definition shall not include women who receive maternity care in the home of a relative or in general or special hospitals, licensed according to law, in which maternity treatment and care is part of the medical services performed and the care of children is only brief and incidental.

(15) "Probation" means a legal status created by court order following adjudication in a delinquency case, whereby a child or youth is permitted to remain in the community, subject to supervision by the court or an agency designated by the court and subject to being returned to court at any time during the period of probation.

(16) "Protective supervision" means a legal status created by court order following adjudication in a deprivation case, whereby a child's place of abode is not changed but assistance directed at correcting the deprivation is provided through the court or an agency designated by the court.

(17) "Shelter" or "shelter care" means temporary care in a non-security or open type of facility.

(18) "Group day-care home" means any place operated by any person or group wherein are received for pay not less than seven nor more than 18 children under 18 years of age for care and supervision for less than 24 hours per day. (Ga.L.1963, p. 81, § 3; Ga.L.1982, p. 706, §§ 2, 6–8.)

O.C.G.A.

49–5–8. Powers and duties of department.

(a) The Department of Human Resources is authorized and empowered, through its own programs and the programs of county or district departments of family and children services, to establish, maintain, extend, and improve throughout the state, within the limits of funds appropriated therefor, programs that will provide:

(1) Preventive services as follows:

(A) Collecting and disseminating information about the problems of children and youths and providing consultative assistance to groups, public and private, interested in developing programs and services for the prevention, control, and treatment of dependency, deprivation, and delinquency among the children of this state; and

(B) Research and demonstration projects designed to add to the store of information about the social and emotional problems of children and youths and improve the methods for dealing with these problems;

(2) Child welfare services as follows:

(A) Casework services for children and youths and for mothers bearing children out of wedlock, whether living in their own homes or elsewhere, to help overcome problems that result in dependency, deprivation, or delinquency;

(B) Protective services that will investigate complaints of deprivation, abuse, or abandonment of children and youths by parents, guardians, custodians, or persons serving in loco parentis and, on the basis of the findings of such investigation, offer social services to such parents, guardians, custodians, or persons serving in loco parentis in relation to the problem or bring the situation to the attention of a law enforcement agency, an appropriate court, or another community agency;

(C) Supervising and providing required services and care involved in the interstate placement of children;

(D) Homemaker service, or payment of the cost of such service, when needed due to the absence or incapacity of the mother;

(E) Boarding care, or payment of maintenance costs, in foster family homes or in group-care facilities for children and youths who cannot be adequately cared for in their own homes;

(F) Boarding care or payment of maintenance costs for mothers bearing children out of wedlock prior to, during, and for a reasonable period after childbirth; and

(G) Day-care services for the care and protection of children whose parents are absent from the home or unable for other reasons to provide parental supervision;

(3) Services to courts, upon their request, as follows:

(A) Accepting for casework services and care all children and youths whose legal custody is vested in the department by the court;

(B) Providing shelter or detention care for children prior to examination and study or pending court hearing;

(C) Making social studies and reports to the court with respect to children and youths as to whom petitions have been filed;

(D) Following an adjudication by the court or discharge from an institution, providing probation services, protective supervision, or after-care (parole) supervision to specific children and youths; and reporting thereon to the court at such times and in such manner as the court shall direct; and

(E) Providing casework services and care or payment of maintenance costs for children and youths who have run away from their home communities within this state, or from their home communities in this state to another state, or from their home communities in another state to this state; paying the costs of returning such runaway children and youths to their home communities; and providing such services, care, or costs for runaway children and youths as may be required under Chapter 3 of Title 39;

(4) Regional group-care facilities for the purpose of:

(A) Providing local authorities an alternative to placing any child in a common jail;

(B) Shelter care prior to examination and study or pending a hearing before juvenile court;

(C) Detention prior to examination and study or pending a hearing before juvenile court; and

(D) Study and diagnosis pending determination of treatment or a hearing before juvenile court;

(5) State institutional facilities, including the existing institutions, to wit: the Training Schools for Boys and Girls located at Adamsville, Milledgeville, and Augusta, Georgia, and additional facilities designed to afford specialized and diversified programs, such as open institutions, closed institutions, forestry camps, ranches, and group residences, for the care, treatment, and training of children and youths of different ages and different emotional, mental, and physical conditions;

(6) Regulation of child-placing and child-caring agencies by:

(A) Setting standards for and providing consultation and making recommendations concerning establishment and incorporation of all such agencies; and

(B) Licensing and inspecting regularly all such agencies to ensure their adherence to established standards as prescribed by the department;

(7) Adoption services, as follows:

(A) Supervising the work of all child-placing agencies;

(B) Providing services to parents desiring to surrender children for adoption as provided for in adoption statutes;

(C) Providing care or payment of maintenance costs for mothers bearing children out of wedlock and children being considered for adoption;

(D) Inquiring into the character and reputation of persons making application for the adoption of children;

(E) Placing children for adoption; and

(F) Providing financial assistance after the consummation of a legal adoption to families adopting children who would otherwise remain in foster care at state expense. Financial assistance may only be granted for hard-to-place children with physical, mental, or emotional handicaps or with other problems for whom it is difficult to find a permanent home. Financial assistance may not exceed 75 percent of the amount paid for boarding such child and for special services such as medical care not available through insurance or public facilities. Such supplements shall only be available to families who could not provide for the child adequately without continued financial assistance. The department may review the supplements paid at any time but shall review them at least annually to

determine the need for continued assistance;

(8) Staff development and recruitment programs through in-service training and educational scholarships for personnel as may be necessary to assure efficient and effective administration of the services and care for children and youths authorized in this article. The department is authorized to disburse state funds to match federal funds in order to provide qualified employees with graduate or post-graduate educational scholarships in accordance with rules and regulations adopted by the board pursuant to Article VIII, Section VII, Paragraph I of the Constitution of Georgia; and

(9) Miscellaneous services, such as providing all medical, hospital, psychiatric, surgical, or dental services or payment of the costs of such services as may be considered appropriate and necessary by competent medical authority to those children subject to the supervision and control of the department without securing prior consent of parents or legal guardians.

(b) The department is authorized to perform such other duties as may be required under related statutes.

(c)(1) As used in paragraph (2) of this subsection, the term "state" means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, or any territory or possession of or territory or possession administered by the United States.

(2) The Department of Human Resources is authorized to enter into interstate compacts, on behalf of this state, with other states to provide for the reciprocal provision of adoption assistance services.

. . . .

O.C.G.A.

49–5–9. Use of public and private institutions and agencies; inspections; examination and control of children not in department's facilities.

(a) The department is authorized to make use of law enforcement detention, supervisory, medical, educational, and other public or private facilities, institutions, and agencies within the state for the purposes of this article; provided, however, that this shall not give the department authority to transfer any child or youth under its custody and control to any penal institution in the state without due process of law. When funds are available, the department may enter into agreements with appropriate private or public officials of private or public institutions and agencies for separate care and special treatment of children and youths subject to the control of the department.

The department is given the right and is required to inspect periodically all public and private institutions and agencies whose facilities it is using. Every institution and agency, whether public or private, is required to afford the department reasonable opportunity to examine or consult with children and youths committed to the department who are for the time being in the custody of the institution or agency.

Placement of a child or youth by the department in any institution or agency not operated by the department or the release of such child or youth from such an institution or agency shall not terminate the control of the department over such child or youth. No child or youth placed in such institution or under such an agency may be released by the institution or agency without the approval of the department. (Ga.L. 1963, p. 81, § 12.)

O.C.G.A.

49–5–12. Licensing and inspection of private and public child welfare agencies and facilities; receiving children; reports; revocation or refusal of license; penalties for unlicensed operation or placement of children; penalties for interference with inspections; civil penalties; enjoining violations.

(a) "Child welfare agency" means any child-caring institution, child-placing agency, maternity home, family boarding home, family day-care home, group day-care home, and day-care center.

(b)(1) All child welfare agencies, as defined in subsection (a) of this Code section, shall be licensed annually by the

department in accordance with procedures, standards, rules, and regulations to be established by the board; provided, however, that the department may require persons who operate family day-care homes to register with the department. The board shall develop and publish standards for licensing of child welfare agencies. A license issued to a child welfare agency shall be deemed approval of all family boarding homes, foster family homes, and family day-care homes approved, supervised, and used by the licensed agency as a part of its work, subject to this article and rules and regulations of the board.

(2) The department shall have the responsibility to review existing day-care regulations to determine which regulations are necessary to safeguard and protect the well-being and general welfare of children and youth, which regulations could more appropriately be issued as guidelines for quality day care, and which regulations unnecessarily restrict the delivery of day-care services. A list of proposed rule changes shall be submitted to the Board of Human Resources no later than November 1, 1982. Copies of the proposed changes shall be submitted to the Lieutenant Governor, the Speaker of the House of Representatives, and the chairmen of the Senate Human Resources Committee and the House Health and Ecology Committee.

(3) No later than December 31, 1982, the department shall publish and make available to day-care centers and interested persons a list of guidelines for quality child care.

(4) After a family day-care home, group day-care home, or day-care center has been licensed or registered by the department as provided in this article, the facility shall not be required to have a permit to operate a food service establishment as required in Code Section 26-2-371, provided that standards for food service have been incorporated in the regulations for licensing or registering such agencies.

(c) The department shall assist applicants or licensees in meeting standards of the department and, if a licensee is, for any reason, denied renewal of a license or if a license is revoked or if any applicant for a license cannot meet department standards, the department shall assist in planning the placement of children, if any, in the custody of such child welfare agency in some other licensed child welfare agency or assist in returning them to their own homes or in making any other plans or provisions as may be necessary and advisable to meet the particular needs of the children involved.

(d) Application for a license shall be made to the department upon forms furnished by the department. Upon receipt of an application for a license and upon presentation by the applicant of evidence that the child welfare agency meets the standards prescribed by the department, the department shall issue such child welfare agency a license for a one-year period.

(e) If the department finds that any child welfare agency applicant does not meet standards prescribed by the department but is attempting to meet such standards, the department may, in its discretion, issue a temporary license to such child welfare agency, but such temporary license shall not be issued for more than a one-year period. Upon presentation of satisfactory evidence that such agency is making progress toward meeting prescribed standards of the department, the department may, in its discretion, reissue such temporary license for one additional period not to exceed one year. As an alternative to a temporary license, the department, in its discretion, may issue a restricted license which states the restrictions on its face.

(e.1) The department shall refuse a license upon a showing of:

(1) Sporadic noncompliance with those rules and regulations which are designated in writing to the facilities as being related to children's health and safety;

(2) Flagrant and continued operation of an unlicensed facility in contravention of the law; or

(3) Prior license denial or revocation within one year of application.

(f) All child welfare agencies shall prominently display the license issued to such agency by the department at some point near the entrance of the premises of such agency that is open to view by the public.

(g) The department's action revoking or refusing to renew or issue a license required by this Code section shall be preceded by notice and opportunity for a hearing and shall constitute a contested case within the meaning of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," except that only 30 days' notice in writing from the commissioner's designee shall be required prior to license revocation and except that hearings held relating to such action by the department may be closed to the public if the hearing officer determines that an open hearing would be detrimental to the physical or mental health of any child who will testify at that hearing.

(h) Reserved.

(i) Reserved.

(j) Reserved.

(k) Child-caring institutions and child-placing agencies, when licensed in accordance with this Code section, may receive needy or dependent children from their parents, guardians, custodians, or persons serving in loco parentis for special, temporary, or continued care. Parents, guardians, custodians, or persons serving in loco parentis to such children may sign releases or agreements giving to such institutions or agencies custody and control over such children during the period of care.

(l) Child-placing agencies, in placing children in foster family homes, shall safeguard the welfare of such children by thoroughly investigating each such home and the character and reputation of the persons residing therein and shall adequately supervise each home during the period of care. All children placed in foster family homes shall, as far as is practicable, be placed with persons of the same religious faith as the children themselves or the children's parents.

(m) It shall be the duty of the department to inspect at regular intervals all licensed child welfare agencies within the state, including all family boarding homes, foster family homes, and family day-care homes used by such agencies. The department shall have right of entrance, privilege of inspection, and right of access to all children under the care and control of the licensee.

(n) If any flagrant abuses, derelictions, or deficiencies are made known to the department or its duly authorized agents during their inspection of any child welfare agency or if, at any time, such are reported to the department, the department shall immediately investigate such matters and take such action as conditions may require.

(o) If abuses, derelictions, or deficiencies are found in the operation and management of any child welfare agency, they shall be brought immediately to the attention of the management of such agency; and if correctable, but not corrected within a reasonable time the department shall revoke the license of such agency in the manner prescribed in this Code section.

(p) Each child welfare agency shall make an annual report of its work to the department in such form and at such time as the department shall prescribe. The department shall prepare and supply child welfare agencies with all forms needed for the purpose of providing the department with such information as may, from time to time, be required by the department.

(q) Child welfare agencies and other facilities and institutions wherein children and youths are detained which are operated by any department or agency of state, county, or municipal government shall not be subject to licensure under this Code section, but the department may, through its authorized agents, make periodic inspections of such agencies, facilities, and institutions. Reports of such inspections shall be made privately to the proper authorities in charge of such agencies, facilities, or institutions. The department shall cooperate with such authorities in the development of standards that will adequately protect the health and well-being of all children and youths detained in such agencies, facilities, and institutions or provided care by them. The department may recommend

changes in programs and policies and if, within a reasonable time, the standards established by the department and the recommendations of the department are not met, it shall be the duty of the commissioner to make public in the community in which such agency, facility, or institution is located the report of the above-mentioned inspection and the changes recommended by the department. If any serious abuses, derelictions, or deficiencies are found and are not corrected within a reasonable time, the commissioner shall report them in writing to the Governor,

(r) Any child welfare agency that shall operate without a license issued by the department shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than $50.00 nor more than $200.00 for each such offense. Each day of operation without a license shall constitute a separate offense.

(s) No person, official, agency, hospital, maternity home, or institution, public or private, in this state shall receive or accept a child under 17 years of age for placement or adoption or place such a child, either temporarily or permanently, in a home other than the home of the child's relatives without having been licensed by the department. Notwithstanding the provisions of Code Section 49–5–12.1, violation of this subsection shall be punishable by a fine of not less than $100.00 nor exceeding $500.00 for each offense. Nothing in this Code section shall be construed to prohibit a properly licensed attorney at law from providing necessary legal services and counsel to parties engaged in adoption proceedings.

(t) The department may, without regard to the availability of other remedies, including administrative remedies, seek an injunction against the continued operation of a child welfare agency without a license or the continued operation of a child welfare agency in willful violation of this article or of any regulation of the department or in violation of any order of the board. (Ga.L. 1963, p. 81, §§ 3, 14; Ga.L.1967, p. 772, § 1; Ga.L.1973, p. 560, § I; Ga.L.1982, p. 3, § 49; Ga.L.1982, p. 706, §§ 1, 3, 9, 10; Ga.L.1983, p. 3, § 38; Ga.L.1984, p. 22, § 49; Ga.L.1986, p. 1038, § 1.)

O.C.R.R.G.

290-2-12-.08 Foster Care Services. Amended.

(1) Foster care shall be considered only after it has been established that it would be detrimental to the child physically and/or emotionally to remain with his family.

(2) If the child cannot remain with his family, a plan of care for the child and the family shall be developed and such plan shall be reevaluated for appropriateness in a case review conference at least every 6 months. The plan shall include, but not be limited to:

(a) Selection and description of the type of placement appropriate to meet the child's needs;

(b) Projected duration of the placement;

(c) Preplacement activities with child and family;

(d) Medical services;

(e) Specific treatment goals for child and family;

(f) Specific steps to be taken by the Agency and the family to achieve each goal;

(g) Specific time frames for achieving the goals;

(h) Designation of responsibility for carrying out steps with child, birth parents, foster parent, adoptive parent and court (when involved) including frequency of contacts;

(i) Date for first review of progress on steps and goals;

(j) Description of the conditions under which the child shall be returned home or when termination of parental rights should be initiated;

(k) Visitation plan.

(3) The selection of a foster home or group care facility for a particular child shall be based on an assessment of the child's total needs and how well a particular program can meet the child's needs.

(4) Children of the same family shall be kept together when possible unless it has been determined through casework services that this is not desirable.

(5) An effort should be made to place a child with families whose religious beliefs are similar to those of his birth parent and where they will receive religious training accordingly—if such becomes an issue of concern for the birth parent and or the child.

(6) An Agency shall make provision for adequate and appropriate clothing for each child admitted into foster care.

(7) Provisions for visits between parents and children shall be made, except where the parental rights have been terminated or where it is documented that visits are detrimental to the child. The parents and the child shall be informed of the visitation plan.

(8) The Agency shall provide for a complete health and dental program for each child including:

(a) A physical examination at the time of or within 3 months prior to admission;

(b) Correction, improvement of health and dental defects;

(c) Immunizations appropriate for the age of the child.

(9) The Agency shall provide opportunity for academic and/or vocational training for each child in accordance with his ability and special aptitude and as required by the school attendance laws of the state.

(10) The Agency shall provide funds for each child for individual personal items, allowances.

(11) Termination of Agency care shall be determined by casework study and planning with the child and his family and/or court or local public agency responsible for the child.

(12) Foster Homes used by the Agency shall conform to the standards for foster family care adopted by the Department.

(13) The Agency shall make a thorough and complete study of each Foster Home which shall evaluate the following:

(a) The motives for boarding;

(b) The adjustment of each member of the foster family to each other and the community;

(c) Foster family's attitude toward the parents of the foster children including parental visits in their home;

(d) Expectations of behavior and attitude of foster children;

(e) Physical standards of the home including space. Water supply and sewage disposal systems, if other than community systems, shall be approved by the local health authorities;

(f) Assessment of community resources, including accessible schools, churches, recreation, medical facilities, mental health facilities;

(g) Health, physical, mental and emotional, conditions of each member of the foster family;

(h) Foster parent training;

(i) Support network systems for single parents, if applicable;

(j) Adequacy of financial resources.

(14) Foster homes used by the Agency shall be located within a reasonable travel distance from the Agency so as to permit regular visits by family and Agency staff.

(15) The Agency shall have a clear understanding in writing with the foster parent regarding its policies as to payment of board, arrangements for medical care, clothing, incidental expenses, visits by parents, discipline, advanced notices for removal when placements are terminated by foster parent and emergency procedures.

(16) Supervision of children placed in foster homes shall be maintained by the Agency through visits made at regular intervals and as frequently as is necessary for the best interest of the child. There shall be at least one personal contact per month.

(17) Foster Home Records.

(a) The Agency shall maintain separate records for each foster home. The record shall be started at the time of application.

(b) The foster home record shall contain:

1. The application;

2. Home study;

3. Medical reports for each member of the foster family;

4. Summary narrative containing the dates as well as the content material from the Caseworker's contacts;

5. References;

6. Annual evaluation of strengths and weaknesses of the foster family and assessment of the best way to maximize the foster care experience for the foster family and the children placed with them. This evaluation shall be shared with the foster family;

7. Placement history of the foster home, children placed, dates admitted and discharged and pertinent narrative information about the interaction and relationships within the foster family;

8. Recommendation as to the type, age, and sex of child best served by the foster parent;

9. Copy of all agreements.

(18) Foster home records shall be maintained for at least 3 years following the Agency's last placement in said foster home.

(19) The record for a child placed in foster care shall include:

(a) Name, sex, race, birthdate and birthplace of child;

(b) Name, address, telephone number and marital status of parent or of guardian of the child;

(c) Name, address, telephone number of the foster parent with whom child has been placed;

(d) Legal documents including verified birth record, court status, agreements, consents, etc.;

(e) A report of the circumstances precipitating the decision to place the child, the Agency's involvement with the parents, including services offered, delivered or rejected. If placement is court ordered, the case record shall contain the court papers, summaries and copies of the required court reports;

(f) Social history of the family and parent background;

(g) Medical history and cumulative health record, psychological and psychiatric reports;

(h) Educational records and reports;

(i) Plan of care according to Rule 290-2-12-.08, paragraph (2);

(j) Summary of case review conference which reflects the contacts with and the status of all family members in relation to the placement plan as well as the achievements or changes in the goals;

(k) Summary of the administrative and other Agency case review (where applicable) on the progress of each child toward determined goals;

(l) Summary of child's contacts with the family, the quality of the relationships and the child's progress in coping;

(m) Upon termination of placement of the child, the following shall be placed in the record.

1. Date of termination, reason for termination, the name, telephone number, address, and relationship of the person or Agency assuming responsibility for the child.

2. A termination summary describing the services provided during care, growth and accomplishments, and assessed needs which remain to be met with the service possibilities which might meet those needs.

3. Aftercare plans which determine the responsibility for follow through.

(20) Family child records shall be maintained for at least 3 years following completion of service.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part, in which RONEY, Chief Judge, and HILL, Circuit Judge, join:

The majority today holds that a state foster care caseworker, his immediate supervisor, and everyone else in the chain of supervision between the caseworker and the director of the state welfare department (including the director) can be held liable for physical injuries deliberately in-

flicted on a child by her foster parents. The majority bases its conclusion on two theories of liability. First, purporting to follow *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), the majority holds that the officials can be held liable on the theory that they were "deliberately indifferent" to the duties of their offices. Assuming the validity of the principle *Doe* articulated— that an official may be held liable under 42 U.S.C. § 1983 (1982) for permitting a child to remain in a foster home while knowing that the child will be exposed to a substantial risk of child abuse or knowing facts that would lead any reasonable person to recognize that risk—the facts of this case neither resemble those in *Doe* nor satisfy the standard *Doe* enunciated. Moreover, the majority's holding cannot be reconciled with the Supreme Court's decision in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), a decision that both *Doe* and the majority fail to address. I therefore dissent from the majority's holding on the *Doe* claim.

The majority today also holds that the Georgia foster care scheme gave the foster child in this case a "legitimate claim of entitlement," under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), thus creating a procedural due process claim for the injury she sustained at the hands of her foster parents. I disagree with this conclusion and

accordingly dissent from the majority's holding on the *Roth* claim. I concur in the majority's disposition of count III of the complaint, upholding the panel's decision that count III failed to state a claim for relief.

## I.

The facts of this case, as stated in the complaint, are crucial to our consideration of this appeal.[1] Kathy Jo Taylor, the plaintiff, was born on February 3, 1980. On April 28, 1982, the plaintiff was removed from the custody of her natural parents by order of the Gwinnett County, Georgia, Juvenile Court.[2] That court placed her in the temporary custody of the Gwinnett County Department of Family and Children's Services (DFACS), a division of the Georgia Department of Human Resources (DHR). In August 1982, DFACS placed the plaintiff in a foster home.[3] According to the complaint, the foster parents, Roy Michael Lathren and Linda Price Lathren, "were legally and morally unfit to be entrusted with the custody, supervision, and care of the Plaintiff and such fact was known to the Defendants or should have been known to them in the exercise of even slight care."

In October 1982, the plaintiff suffered serious physical injuries and eventually lapsed into a coma from which she has yet to recover. The circumstances surrounding this tragedy are uncertain.[4] The com-

---

**1.** Because the legal sufficiency of count II of the complaint (the *Doe* claim) turns on the adequacy of the *facts* alleged in that count, I include the entire complaint as an appendix to my opinion.

**2.** The complaint does not allege on whose initiative the court began dependency proceedings. *See generally* Ga.Code Ann. § 15–11–24 (1985) ("[T]he petition alleging ... deprivation ... of a child may be made by any person, including a law enforcement officer, who has knowledge of the facts alleged or is informed and believes that they are true.").

**3.** Foster homes in Georgia are licensed by the state. *See infra* Part III. Once a child has been adjudicated a dependent, the court may, for example, place the child in the custody of the county department of family and children's services, which in turn may put the child in a

licensed foster home. Alternatively, the court may give custody of the child to a licensed child-placing agency for placement in a foster home. *See* Ga.Code Ann. § 15–11–34 (1985). The complaint does not allege that any "child-placing agency," as defined under Georgia law, played a role in the selection of the foster home in this case or in the supervision of the plaintiff's stay in that home. *See generally infra* Part III (discussing Georgia foster care scheme). I thus assume that no child-placing agency was involved in the plaintiff's placement and that DFACS placed the plaintiff directly in the foster home.

**4.** The complaint includes, for example, an allegation that the defendants "were grossly negligent and deliberately indifferent in failing to acquire or procure complete physical and medical data concerning the Plaintiff and to provide

plaint alleges that the plaintiff, "on or about October 13, 1982, was wantonly and willfully struck, shaken, thrown down, beaten, and otherwise severely abused by the foster mother." Further, the complaint alleges that "[t]he foster parents wantonly and willfully failed to seek emergency medical treatment for the Plaintiff until October 17, 1982, when she suffered seizures and lapsed into a coma."

The plaintiff, through her guardian ad litem, brought suit in the district court under 42 U.S.C. § 1983 (1982). The complaint named several defendants: James G. Ledbetter, Ph.D., Commissioner of the DHR; Patricia Johnson, Ph.D., Director of the DHR's Division of Family and Children's Services; Frederick B. Webb, Director of DFACS; Sonyonna Stone Danielle, supervisor of placement services for DFACS; and Jo Ann Hoover and W.R. Berry, DFACS caseworkers. The complaint consisted of three counts, two of which are relevant here. Count I alleged that the defendants, in violation of the fourteenth amendment, deprived the plaintiff of liberty without due process of law by denying her entitlements (an adequate preplacement investigation, and subsequent supervision of her custody in her

foster home) that the Georgia foster care scheme granted her. In count II, the plaintiff alleged that the defendants violated the substantive guarantees of the eighth and fourteenth amendments because, with deliberate indifference, they failed to discharge their duty to inspect the Lathren home before placing the plaintiff there and they failed to supervise the Lathrens' care of the child.[5]

Pursuant to Fed.R.Civ.P. 12(b)(6), the district court dismissed, without leave to amend,[6] all counts of the plaintiff's complaint. The plaintiff then appealed. A divided panel of this court affirmed, finding that (1) the plaintiff's factual allegations in count II were insufficient to state a "deliberate indifference" substantive due process claim under *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir.1981), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), because the complaint did not allege that the defendants had knowledge of a risk of physical abuse to the child and that they acted or failed to act in deliberate indifference to that risk, and (2) as to count I, the Georgia foster care scheme does not create the alleged "legitimate claim of entitlement" under *Board of Regents v. Roth*, 408 U.S. 564, 92

same to the foster parents to whom the custody, supervision, and care of the Plaintiff was given." In light of other allegations in the complaint, this statement apparently is part of an alternate explanation for the plaintiff's injuries, i.e., that her injuries resulted from an unnecessary or excessive dose of medicine, not from physical abuse by her foster mother.

5. Count III alleged that the defendants deprived the plaintiff of rights guaranteed by 42 U.S.C. §§ 601–615 (1982 & Supp. III 1985) (Social Security Act provisions governing aid to families with dependent children). I concur in the majority's affirmance of the district court's dismissal of count III, a claim which merits no further discussion.

6. The district court dismissed count I because it concluded that the Georgia foster care scheme consisted of procedural guidelines and did not create a "legitimate claim of entitlement" under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The court dismissed count II on several grounds. First, it correctly noted that the eighth amendment is inapplicable outside the

prison context. Second, it indicated that the plaintiff "has specifically not sought to recover" under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir.1981), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Although the complaint is ambiguous, I believe it at least attempts to allege a *Doe* claim. The plaintiff argued the merits of this claim in her brief opposing the defendants' motion to dismiss, and in her brief in support of her motion to alter the district court's final judgment and for a rehearing. Third, the court believed that the defendants were immune from liability under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); the majority does not address the immunity question, which should be reconsidered by the district court on remand. Finally, the court believed that the complaint merely alleged administrative negligence insufficient to state a claim under section 1983.

As to count III, the district court properly dismissed the plaintiff's claim in light of the rationale of *Black v. Beame*, 550 F.2d 815 (2d Cir.1977) (portions of Social Security Act governing aid to families with dependent children do not create a private cause of action).

S.Ct. 2701, 33 L.Ed.2d 548 (1972), because it creates procedural guidelines, not specific rights or entitlements. We took this case en banc to determine whether either of these counts of the complaint states a claim upon which relief may be granted. For convenience of analysis, I will address the count II claim first.

## II.

### A.

The plaintiff's count II claim is that each of the defendants deprived her of substantive rights, secured by the eighth amendment[7] and the due process clause of the fourteenth amendment, to be free from physical abuse at the hands of her foster parents. In analyzing this claim, it is important to note that the plaintiff does not contend that any of the defendants personally participated in the infliction of her injuries. *Cf. Martinez v. California*, 444 U.S. 277, 285 & n. 10, 100 S.Ct. 553, 559 & n. 10, 62 L.Ed.2d 481 (1980).

7. The eighth amendment's protections are of course made applicable to the states by the fourteenth amendment, *see Estelle*, 429 U.S. at 101, 97 S.Ct. at 289. The eighth amendment only applies to convicts in government custody and thus is obviously inapplicable here. I therefore treat count II as asserting a substantive right created by the "penumbras" of the Bill of Rights and made enforceable against the states by the due process clause of the fourteenth amendment. In this opinion, I assume for sake of discussion that the Bill of Rights created the substantive right that the plaintiff asserts in count II.

8. Section 1983 provides a federal remedy against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (1982). Every section 1983 action requires a showing (1) that the defendant deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or federal law, and (2) that the defendant was acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Dollar v. Haralson County*, 704 F.2d 1540, 1542–43 (11th Cir.), *cert. denied*, 464 U.S. 963, 104 S.Ct. 399, 78 L.Ed.2d 341 (1983). Except for count III, which is meritless,

The plaintiff relies on the Second Circuit's opinion in *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), to support her claim that she was deprived of substantive constitutional rights. In essence, the *Doe* court held that the Supreme Court, given its reasoning in the eighth amendment case of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), would recognize as a fundamental constitutional right the right of a foster child to be free of physical abuse caused by the deliberate indifference of state welfare officials responsible for the child's supervision. In *Estelle*, the Supreme Court, observing that a state has an obligation to provide its prison inmates necessary medical care, held that the "deliberate indifference" of state prison personnel to an inmate's serious illness or injury constitutes cruel and unusual punishment, giving rise to a claim under 42 U.S.C. § 1983.[8] As the Court stated, "[t]his is true whether the indiffer-

*see supra* notes 5 & 6, the plaintiff's complaint is based solely on an alleged deprivation of constitutional rights.

To establish that a state official's nonfeasance has deprived an individual of a constitutional right, a section 1983 plaintiff must prove three elements. First, he must demonstrate the existence of a custodial or other special relationship in which the state has exposed the plaintiff to harm or danger. *See Estelle*, 429 U.S. at 103–04, 97 S.Ct. at 290–91; *Jones v. Phyfer*, 761 F.2d 642, 645–47 (11th Cir.1985); *Jensen v. Conrad*, 747 F.2d 185, 193 (4th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); *Doe*, 649 F.2d at 141.

Second, the alleged nonfeasance must *cause* the deprivation of a constitutional right. *See Martinez*, 444 U.S. at 284–85, 100 S.Ct. at 559; *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 (11th Cir.1985) (en banc) (plaintiff must prove the existence of an "affirmative link" between the alleged deprivation and the action or inaction of the state officials), *cert. denied*, —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 *and* —— U.S. ——, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986); *see also Doe*, 649 F.2d at 141 ("[T]he omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest.") (citation omitted). This causation requirement is more stringent than, for example, the proximate cause requirement of tort law. *See Martinez*, 444 U.S. at 285, 100 S.Ct. at 559 ("Regardless of whether, as a matter of state tort law, the parole board could be said

ence is manifested by prison doctors in their response to the prisoner's needs or by prison guards in *intentionally* denying or delaying access to medical care or *intentionally* interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05, 97 S.Ct. at 291 (emphasis added) (footnotes omitted).

The Seventh Circuit applied the *Estelle* rationale in a case in which a mental patient murdered a woman after being discharged from a state psychiatric hospital. *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982). Her personal representative sought to hold the hospital officials who were responsible for the discharge liable in damages because they allegedly released the patient with reckless disregard for the public's safety. *Id.* at 617. The court upheld the district court's judgment summarily dismissing the plaintiff's claim on the merits, but acknowledged that a constitutional claim for reckless indifference could lie, under 42 U.S.C. § 1983, depending on the facts of the particular case.[9]

> If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit. It is on this theory that state prison personnel are sometimes held liable under section 1983 for the violence of one prison inmate against another.

*Bowers*, 686 F.2d at 618 (citation omitted).

The potential reach of the *Estelle* principle, expressed as a substantive right included within the penumbras of the Bill of Rights and made applicable in non-prisoner contexts, *see supra* note 7, is very broad, subjecting government officials to possible liability for a wide range of misconduct by private actors. The federal courts, however, have been careful to establish limits on the scope of *Estelle*-type liability, limits that are essential to retain the character of section 1983 as a remedy for violations of constitutional magnitude, not "a font of tort law," *see Daniels v. Williams*, 474 U.S. 327, —, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986) (quoting *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)).

Even before the *Bowers* decision, for example, the Supreme Court recognized the need for liability limits. In *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), the personal representative of a girl, murdered by a mentally disturbed sex offender while he was on parole, attempted to obtain money damages under section 1983 against the state officials who were responsible for paroling the offender. The personal representative alleged that the officials deprived the decedent of procedural due process of law under the fourteenth amendment because they released the offender knowing that he would probably commit a violent crime, such as the murder at issue. *Id.* at 279–81,

---

... to have proximately caused [the victim's] death, we hold that, taking these particular allegations as true, appellees did not 'deprive' [the victim] of life within the meaning of the Fourteenth Amendment.") (citations omitted).

The third requirement for section 1983 liability is that the state officials must have displayed at least "deliberate indifference" to the plaintiff's situation. *Estelle*, 429 U.S. at 104–06, 97 S.Ct. 291–92; *Doe*, 649 F.2d at 141. This requirement is the focus of my dissent concerning the plaintiff's *Doe* claim.

**9.** The Seventh Circuit's opinion in *Bowers* did not indicate the specific constitutional source of the substantive right, if any, on which the deceased woman's personal representative based his claim. The court appears to have treated

the personal representative as having asserted a procedural due process right under the fourteenth amendment. The court stated, in this context, that

> [t]here is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law. But there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment or, we suppose, any other provision of the Constitution.

*Bowers*, 686 F.2d at 618 (citation omitted).

100 S.Ct. at 556–57.[10] (As I discuss in Part II.B. *infra*, the complaint in the instant case, in contrast, does not allege that any defendant knew that the plaintiff would be exposed to a substantial risk of physical abuse in the Lathren foster home.) A unanimous Supreme Court rejected the personal representative's section 1983 claim, holding that the allegations of his complaint failed to state a claim of constitutional magnitude, as distinguished from a claim under state tort law:

Although the decision to release [the offender] from prison was action by the State, the action of [the offender] five months later cannot be fairly characterized as state action. Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to his victim or to have proximately caused her death, we hold that, taking these particular allegations as true, [the parole officials] did not "deprive" [the] decedent of life within the meaning of the Fourteenth Amendment.

[The decedent's] life was taken by the [offender] five months after his release. He was in no sense an agent of the parole board. Further, the parole board *was not aware* that [the] decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, [the] decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights

law. Although a § 1983 claim has been described as "a species of tort liability," it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.

*Id.* at 284–85, 100 S.Ct. at 559 (citations and footnotes omitted) (emphasis added); *see also Bowers,* 686 F.2d at 617–19 (state mental hospital not liable under section 1983 for releasing a mental patient who subsequently murdered a woman, because the officials had not knowingly placed the victim, a member of the general public, in a position of danger).

Sixteen months after the Supreme Court handed down its *Martinez* decision, the Second Circuit decided *Doe.* That case involved a section 1983 claim by a foster child against a child-placement agency licensed by the City of New York.[11] She alleged that her foster father had sexually abused her for a number of years, that the agency had knowledge of facts placing it on notice of that abuse, and that the agency ignored these facts and had done nothing to alleviate the situation. The agency's conduct, she alleged, amounted to deliberate indifference to her safety in the foster home and thus deprived her of a liberty interest without due process of law, in violation of the fourteenth amendment. *Doe,* 649 F.2d at 137–40.

*Doe* was tried by a jury, which exonerated the child placement agency. The plaintiff appealed, seeking a new trial on the ground that the district court's jury instruction on the doctrine of deliberate indifference imposed on her a greater burden of proof than that doctrine mandated. The court of appeals agreed and remanded the case for a new trial. *Id.* at 141. In its opinion, the court recognized a point that

**10.** The Supreme Court assumed, for purposes of its decision, that the parole officials "knew, or should have known, that the release of [the offender] created a clear and present danger that such an incident would occur. Their action is characterized [in the complaint] not only as negligent, but also as reckless, willful, wanton and malicious." *Martinez,* 444 U.S. at 280, 100 S.Ct. at 556 (footnote omitted).

**11.** The original defendants in *Doe* were the New York City Department of Social Services and its

former commissioners, the Catholic Home Bureau, and other institutional and individual defendants. All defendants reached a settlement with the plaintiffs, except the Catholic Home Bureau and its caseworkers. The district court dismissed the claims against the caseworkers for failure of service of process. Thus, the only remaining defendant before the court on appeal was the Catholic Home Bureau. *See Doe,* 649 F.2d at 140 n. 1.

we should bear in mind in deciding this case: a foster child seeking damages against a child placement agency or its officials for child abuse inflicted by a foster parent faces a heavier burden in establishing deliberate indifference than does a prison inmate seeking damages against prison officials for cruel and unusual punishment. For example, unlike the prison situation, there is no strong chain of command in the placement and supervision of children in foster care:

> There is a closer and firmer line of authority running from superiors and subordinates within [a penal] institution than exists in the foster care context, particularly in respect of the relationship between agency personnel and the foster parent. [Prison] administrators can readily call in subordinates for consultation. They can give strict orders with reasonable assurance that their mandates will be followed, and as added insurance other employees stationed in proximity of the subordinates to whom orders are directed may be instructed to monitor compliance.

> By contrast, the [foster care agency] ha[s] to rely upon occasional visits for its information gathering, and its relationship to the foster family [is] less unequivocally hierarchical than is the case with prison guards and a warden.

*Id.* at 142. Moreover, to give the child a normal family environment, foster care officials understandably feel "constrained to respect the foster family's autonomy and integrity[,] and [feel] pressured to minimize intrusiveness." *Id.* Prison officials, on the other hand, feel no such constraint or pressure; their role is to monitor and control an inmate's environment and activities on a day-to-day basis. Consequently, prison officials will normally have more information available to them about the conditions of an inmate's confinement than officials overseeing foster care will have about the conditions of a foster home placement.

The deliberate indifference standard of fault—used by the Supreme Court in *Estelle* and, purportedly, by the majority to-day—is analogous to reckless disregard of safety, which is well defined in tort law:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Restatement (Second) of Torts* § 500 (1965) (hereinafter *Restatement*); *see also Doe*, 649 F.2d 143–44 & nn. 4–5. Recklessness, like deliberate indifference, is a higher standard of fault than mere negligence:

> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that *reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.* It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

*Restatement, supra,* § 500 comment g (emphasis added);[12] *see also Doe*, 649 F.2d

---

**12.** The *Restatement* effectively distinguishes intent, recklessness, and negligence as follows:

143–44 & n. 5. Thus, to establish deliberate indifference, a plaintiff must allege and prove that the defendants either had actual knowledge of a substantial risk or had knowledge of facts that would indicate this risk to any reasonable person. *See Estelle*, 429 U.S. at 104–06, 97 S.Ct. at 291–92; *Doe*, 649 F.2d at 141.

As the foregoing discussion demonstrates, it is more difficult for a foster child, who has suffered physical abuse at ·the hands of his or her foster parents, to prove that the abuse flowed from the deliberate indifference of the child placement official than it is for a prison inmate to satisfy that standard in an eighth amendment case. This difference is a function of the notice requirement of the deliberate indifference standard. As the Second Circuit noted in *Doe*, in the relationship between foster care officials and foster parents, the officials will inherently have less information about the foster care setting— and thus less knowledge of potential danger to the foster child—than their prison official counterparts will have concerning the inmates in their charge. With these observations and the Restatement principles in mind, I shall assess the sufficiency of the plaintiff's allegations in count II of her complaint.

### B.

I first assess the plaintiff's allegations against W.R. Berry, the caseworker whom DFACS assigned to handle the plaintiff's case, because he is the defendant most likely to have known that the plaintiff faced a substantial danger of child abuse in the Lathren home or to have had knowledge of facts that would have led a reasonable person to conclude that the plaintiff faced such a danger. The plaintiff alleged that (1) Berry had the duty to investigate the Lathren home and to supervise it while the plaintiff lived there and (2) Berry failed "to make a thorough and complete investigation and study" of that home. These allegations do not even state a claim of negligence, because they do not disclose whether Berry would have discovered, in the exercise of due care, that the plaintiff faced a risk of child abuse if placed in the Lathren home. Nonetheless, granting the plaintiff's complaint the most liberal reading, I proceed on the assumption that the complaint alleges that Berry would have discovered this risk and therefore that it states a cause of action for simple negligence.[13]

To state a claim of deliberate indifference, however, the plaintiff had to allege additional *facts:* that Berry either had actual knowledge that the plaintiff faced a substantial risk of child abuse in the Lathren home or had knowledge of facts that would have caused a reasonable person to conclude that the child faced this risk. The plaintiff alleged no such additional facts. It is true that she alleged that Berry acted with deliberate indifference in failing to carry out his investigative and supervisory duties, a mere conclusion of ultimate fact. The plaintiff did not, however, take the requisite further step and allege that Berry acted with deliberate indifference toward a

All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as defined in § 282.

*Restatement (Second) of Torts* § 8A comment b (1965).

13. As noted *supra* note 1, the complaint is reproduced in the appendix to this opinion. I have italicized every operative *fact* alleged in the complaint, except the conclusory allegations, such as "arbitrary," "grossly negligent," "deliberately indifferent," "gross and culpable misfeasance, malfeasance, and nonfeasance," and "arbitrarily, maliciously, in bad faith, in reckless disregard of and deliberate indifference to the best interests of the Plaintiff." Nowhere in the alleged facts does the plaintiff aver what Berry would have discovered had he carried out his duties of investigation and supervision with due care.

known danger of the child abuse she eventually suffered. The plaintiff did assert that the Lathrens "were legally and morally unfit" to be foster parents (which I will assume means that the Lathrens would likely abuse the plaintiff), but she did not also allege that Berry—or, for that matter, any of the other defendants—*knew* this fact. When the allegations in a complaint are vague and conclusory, "and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim." *Davidson v. State of Georgia*, 622 F.2d 895, 897 (5th Cir.1980) (per curiam) (citations omitted); [14] *see also Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir.1984) ("In civil rights actions, it has been held that a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory.") (citations omitted). Thus, the plaintiff failed to state a claim for relief against Berry in count II of her complaint.

This conclusion is buttressed by the Supreme Court's rationale and holding in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). There, the Court concluded that parole officials could not be held liable under section 1983 even though they released a known sex offender who was likely to commit a violent crime and even though the murder of the victim was foreseeable. *Id.* at 278, 100 S.Ct. at 556. In the instant case, the officials had no knowledge that the Lathrens had any propensity for child abuse.

Similarly, the Seventh Circuit's *Bowers* decision supports my conclusion. As the court noted in *Bowers*, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will

not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). There is no allegation in this case that the Lathren foster home was the equivalent of a snake pit and that the defendants knew this fact or had knowledge of facts that would have led a reasonable person to recognize it as such.

The plaintiff's allegations against the remaining defendants suffer from the same deficiency described above. The allegations do not set forth facts indicating what, if anything, these defendants knew about the danger of physical abuse the plaintiff faced if DFACS placed her, or permitted her to remain, in the Lathren home.[15] All the plaintiff alleged was the conclusion that these defendants [16] were deliberately indifferent in carrying out their duties to ensure that the caseworker, Berry, did his job.

The majority's upholding of count II of the complaint against defendants Ledbetter and Johnson, the DHR officials in the state capital, is particularly disturbing in light of those defendants' complete separation from the events that brought about the plaintiff's injury. This court should bear in mind that section 1983 liability cannot be based on vicarious liability or respondeat superior. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) ("[W]e conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.");[17] *Coffy v.*

**14.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**15.** In fact, the complaint does not even allege that these defendants were aware that the plaintiff was being placed in the Lathren home.

**16.** The statement in the text does not apply to one of the remaining defendants, Jo Ann Hoover, who is a DFACS caseworker. The plaintiff names her in the complaint not because she played a role in the allegedly inadequate investi-

gation or supervision of the Lathren home, but rather because she was the caseworker who was present when the Gwinnett County Juvenile Court placed the plaintiff in the custody of DFACS and because she allegedly failed to consider placing the plaintiff in the custody of the plaintiff's aunt. The complaint contains no allegation that Hoover was responsible for investigating or supervising the Lathren home.

**17.** The Supreme Court's rejection of respondeat superior liability in *Monell* was founded in large part on the express language of section 1983 itself, *see Monell*, 436 U.S. at 691–92, 98 S.Ct. at

*Multi-County Narcotics Bureau*, 600 F.2d 570, 580 (6th Cir.1979) ("Liability under § 1983 may not be imposed upon an official simply on the basis of *respondeat superior.*") (citation omitted). Rather, the plaintiff must allege and prove that each official actively participated in, encouraged, or directed the alleged deprivation. *Ford v. Byrd*, 544 F.2d 194, 195 (5th Cir.1976) (per curiam) (affirming dismissal of section 1983 suit in which plaintiff made no claim that supervisor directed, ordered, participated in, or approved the deprivation); *Coffy*, 600 F.2d at 580.

The complaint alleges no facts even suggesting that defendants Ledbetter and Johnson participated in, encouraged, or directed the plaintiff's placement in the Lathren home, let alone that they acted with deliberate indifference to a substantial risk that the plaintiff would suffer serious physical abuse. On the contrary, the allegations, taken as a whole, make it plain that these defendants had no role in the plaintiff's placement in or the supervision of the Lathren home. All the plaintiff alleged was that these defendants recklessly supervised the child placement activities of DFACS.[18]

In sum, the district court cannot be faulted for concluding that count II of the complaint failed to state a claim for relief against any of the defendants. In granting the defendants' motion to dismiss count II, the court did not give the plaintiff leave to file an amended complaint.[19] The plaintiff, however, did not request such leave, and on appeal has not contended that the district court erred in not according her an opportunity to present sufficient factual allegations by way of an amended count. For these reasons, I would affirm the dismissal of count II.

## III.

The second question this case presents is whether, under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701 (1972), the Georgia foster care statutes and regulations give a dependent child about to be placed in a foster home a "legitimate claim of entitlement," i.e., the right to an adequate preplacement investigation of the foster home and proper postplacement supervision of the home, which the state cannot deny the child without due process of law. In *Roth*, a state university decided not to renew the one-year contract of a non-tenured professor. The professor brought suit, claiming that the university's action violated his procedural due process rights under the fourteenth amendment. As the Supreme Court observed, "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Id.* at 569, 92 S.Ct. at 2705. The *Roth* Court articulated the following standard for determining whether a person

2036–37, and thus applies with equal force to the liability of governmental entities (as in *Monell*) and of supervisory officials. *See also Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).

**18.** The implausible nature of the plaintiff's *Doe* claim against Ledbetter and Johnson is highlighted by the Georgia statutes concerning DHR, to which the plaintiff refers in her complaint and in the briefs. *See also infra* Part III. As commissioner of the DHR, Ledbetter is "the chief administrative officer of the department" and "shall supervise, direct, account for, organize, plan, administer, and execute the functions vested in the department." Ga.Code Ann. § 49–2–1 (1986). The DHR handles a wide array of matters, including rehabilitation services; services for children, the handicapped, and the aged; public assistance; and correctional activities. *See, e.g., id.* §§ 49–2–3, 49–2–6, 49–2–7.

One division of the DHR is the Division of Family and Children Services, *see generally id* §§ 49–2–4, 49–4–3, which was headed by Johnson during the time relevant to this suit. The Division is responsible for social services and public assistance programs within the state, and it coordinates the activities of each county department of family and children services, including DFACS. The Georgia statutes provide only that the director of the Division shall direct and supervise the activities of the Division. *See id.* § 49–4–3(b).

**19.** *See generally* Fed.R.Civ.P. 15(a) (party may amend pleadings "by leave of court ... and leave shall be freely given when justice so requires"); *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597–98 (5th Cir.1981) (noting discretionary nature of decision to grant leave to amend and policy favoring permission when justice so requires).

possesses a constitutionally protected property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in [*Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),] had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

*Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.[20] The Court went on to find that the professor in *Roth* had no legitimate claim of entitlement pursuant to either his employment contract, or to "any state statute or university rule or policy." *Id.* at 578, 92 S.Ct. at 2710.

The principle of *Roth* and subsequent Supreme Court cases is that the due process clause protects property and liberty interests that have been recognized and protected by state law. *See Paul v. Davis*, 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1165,

47 L.Ed.2d 405 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974); *Roth*, 408 U.S. at 571–78, 92 S.Ct. at 2706–10. The state laws or regulations must, however, create a legitimate claim of entitlement; in other words, they must be more than mere procedural guidelines or grants of discretionary authority to state officials. *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Bishop v. Wood*, 426 U.S. 341, 344–47, 96 S.Ct. 2074, 2077–79, 48 L.Ed.2d 684 (1976); *Jean v. Nelson*, 727 F.2d 957, 981 (11th Cir.1984) (en banc), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

In this case, the plaintiff claims, and the majority holds, that the Georgia foster care statutes and regulations create a liberty interest consisting of the right of a dependent child to have a preplacement investigation and subsequent supervision of any foster home in which he or she is placed, and that the defendants deprived her of that liberty interest without due process of law. Because I believe the majority has misread Georgia law and misapplied the dictates of *Roth*, I respectfully dissent from the court's holding on the *Roth* claim.

The majority opinion places a great deal of weight on the *comprehensive* nature of the Georgia foster care scheme, apparently ignoring the Supreme Court's admonition that the mere existence of "a careful procedural structure" does not preordain the existence of a protected liberty interest. *See Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. In fact, the Georgia statutory scheme is comprehensive only in granting broad discretion and authority to officials of the DHR and its county departments. It does not, however, grant to the plaintiff any specific entitlements of the sort the Supreme Court found in *Hewitt*. That case involved a prisoner's challenge to the actions of Pennsylvania prison officials in removing him from the general prison population and placing him in administrative

---

**20.** Of course, the Constitution, through the fourteenth amendment, also protects individual interests that are secured by the Bill of Rights itself—such as the fourth amendment right to be free from unreasonable searches and seizures and the eighth amendment proscription against cruel and unusual punishment—regardless of the content of state law. *See Paul v. Davis*, 424 U.S. 693, 710 n. 5, 96 S.Ct. 1155, 1165 n. 10, 47 L.Ed.2d 405 (1976).

segregation. Under Pennsylvania statutory law, prison officials were not permitted to place inmates in administrative segregation without (1) assessing the need for that action, (2) determining that there is a threat of serious disturbances in the prison, (3) notifying the inmate that he is under investigation and that he will receive a hearing prior to any disciplinary action, (4) performing a complete investigation, and (5) conducting a hearing if the inmate is to be placed in administrative custody. *See id.* at 470 n. 6, 103 S.Ct. at 871 n. 6.

The Georgia foster care scheme was established "to promote, safeguard, and protect the well-being and general welfare of children and youth." Ga.Code Ann. § 49–5–2 (1986). Georgia law grants the DHR and its county departments authority over foster care:

> The Department of Human Resources is authorized and empowered, through its own programs and the programs of county or district departments of family and children services, to establish, maintain, extend, and improve throughout the state, within the limits of funds appropriated therefor, programs that will provide
> . . .
> (2) Child welfare services as follows:
>
> (A) Casework services for children and youths ... to help overcome problems that result in dependency, deprivation, or delinquency ...
>
> (E) Boarding care, or payment of maintenance costs, in foster family homes or in group-care facilities for children and youths who cannot be adequately cared for in their own homes ...
>
> (3) Services to courts, upon their request, as follows:
>
> (A) Accepting for casework services and care all children and youths whose legal custody is vested in the department by the court ...
>
> (6) Regulation of child-placing and child-caring agencies by:
>
> (A) Setting standards for and providing consultation and making recommendations concerning establishment and incorporation of all such agencies; and

> (B) Licensing and inspecting regularly all such agencies to ensure their adherence to established standards as prescribed by the department....

*Id.* § 49–5–8(a). These statutory provisions simply grant the DHR and its county departments, including DFACS, authority and responsibility for the placement of children in foster care.

Significantly, Georgia law gives the DHR and its county departments the power to regulate "child-placing and child-caring agencies," including the power to set standards, license these agencies, and inspect these agencies. *Id.* § 49–5–8(a)(6). A child-placing agency is defined as "any institution, society, agency, or facility, whether incorporated or not, which places children in foster homes for temporary care or for adoption." *Id.* § 49–5–3(2). A child-caring agency "means any institution, society, agency, or facility, whether incorporated or not, which either primarily or incidentally provides full-time care for children under 17 years of age outside of their own homes, subject to such exceptions as may be provided in rules and regulations of the board." *Id.* § 49–5–3(1). These provisions are general grants of power, which by their nature involve broad grants of discretion to the DHR and DFACS: discretion to set standards, to license, and to inspect child-placing and child-caring agencies. A dependent child can have no legitimate claim of entitlement based simply on this grant of authority.

In reaching its conclusion that Georgia law does give rise to a legitimate claim of entitlement on behalf of the plaintiff, the majority relies on three statutory provisions and two regulations. As the following discussion demonstrates, none of these provisions creates an entitlement on behalf of the plaintiff. First, the majority quotes the Georgia code provision defining legal custody of a child to include "[t]he right and the duty to protect, train, and discipline" the child and "[t]he responsibility to provide him with food, clothing, shelter, education, and ordinary medical care." *Id.* § 49–5–3(12). This provision, which simply defines "legal custody," is inapposite. The gist of the plaintiff's complaint concerns

the defendants' alleged failure to inspect and supervise the Lathren home; there is no claim that the DHR or DFACS was directly involved in failing to protect the plaintiff or failing to provide her with medical care.

Second, the majority inexplicably relies on Ga.Code Ann. § 49–5–12($l$), stating that this provision places a mandatory duty on the DHR to investigate thoroughly each foster home and to supervise the home during the period of foster care. In fact, section 49–5–12($l$) places the responsibilities the majority describes on "child-placing agencies," not on DHR or DFACS.[21] As I have noted earlier, DHR and DFACS are empowered to set standards for, license, and inspect child-placing agencies. Section 49–5–12($l$) places the responsibility to inspect and to supervise individual foster homes on "child-placing agencies." Because no such agency, within the meaning of the Georgia code, is a defendant in this case, this section is inapplicable.

Similarly, the majority's reliance on two DHR regulations is misplaced. These regulations provide as follows:

(3) The selection of a foster home or group care facility for a particular child shall be based on an assessment of the child's total needs and how well a particular program can meet the child's needs.

. . . .

(16) Supervision of children placed in foster homes shall be maintained by the *Agency* through visits made at regular intervals and as frequently as is necessary for the best interest of the child.

There shall be at least one personal contact per month.

Ga.Comp.R. & Regs. r. 290–2–12–.08(3), (16) (1984) (emphasis added). Once again, the responsibilities described in these regulations apply to child-placing agencies, not to the DHR and DFACS. These regulations are part of a series of regulations the DHR promulgated specifically to regulate child-placing agencies. *See id.* rr. 290–2–12–.01 to 290–2–12–.14. They are contained in a chapter of the Georgia regulations entitled "Child-Placing Agencies." Moreover, one of the regulations, subsection (16), expressly grants the supervision responsibility to "the Agency," which means the child-placing agency, not the DHR or DFACS. *See id.* r. 290–2–12–.01(i) (defining "agency"); *see also* Ga.Code Ann. § 49–5–3(2) (1986) (defining "child-placing agency").[22] These DHR regulations do not create any duties on the part of DHR or DFACS, and thus they cannot serve as the basis for the plaintiff's *Roth* claim.

Finally, the majority relies on Ga.Code Ann. § 49–5–12(m) (1986), which states as follows:

It shall be the duty of the [DHR] to inspect at regular intervals all licensed child welfare agencies within the state, including all family boarding homes, foster family homes, and family day-care homes used by such agencies. The department shall have right of entrance, privilege of inspection, and right of access to all children under the care and control of the licensee.

**21.** This provision states as follows:

*Child-placing agencies,* in placing children in foster family homes, shall safeguard the welfare of such children by thoroughly investigating each such home and the character and reputation of the persons residing therein and shall adequately supervise each home during the period of care. All children placed in foster family homes shall, as far as is practicable, be placed with persons of the same religious faith as the children themselves or the children's parents.

Ga.Code Ann. § 49–5–12($l$) (1986) (emphasis added).

My conclusion that this provision does not apply to the DHR or DFACS is supported by Georgia's rules of statutory construction. *See*

*id.* § 1–3–8 ("The state is not bound by the passage of a law unless it is named therein or unless the words of the law are so plain, clear, and unmistakable as to leave no doubt as to the intention of the General Assembly.").

**22.** The other regulation, subsection (3), makes no express reference to the entity upon which it places responsibility. Nonetheless, the DHR's placement of this regulation among a series of regulations describing the duties of child-placing agencies makes it plain that the regulation was meant to apply to those agencies. In any event, I believe that subsection (3)—even if it did apply to the DHR and DFACS—is too general to warrant a legitimate claim of entitlement under *Roth.*

This provision does in fact apply to the DHR, placing on it the duty to inspect all foster homes "at regular intervals." This duty arises, however, in connection with its power to license foster homes, *see id.* § 49–5–8(a)(6)(B); it does not confer any specific duty to oversee the placement of an individual child in the foster home. Thus, this section simply requires that the DHR inspect foster homes, as frequently as needed for licensing purposes, to assure that its continued licensing of those homes is warranted. Consequently, this provision does not create a legitimate claim of entitlement to have the DHR conduct a pre-placement investigation or subsequently supervise the placement of an individual child in foster homes.

In addition to dissenting from the majority's analysis of the Georgia foster care scheme, I am troubled by the majority's failure to recognize the analytical problem and the remedies problem created by its holding. As the majority notes, *Roth* and its progeny are *procedural* due process cases. If a court finds that state law creates a "legitimate claim of entitlement," the next step in the *Roth* analysis is to determine what process is due and whether the state provided that process. *See, e.g., Hewitt,* 459 U.S. at 472–77, 103 S.Ct. at 871–74. The focus of this type of analysis is on the requirements of predeprivation notice and a hearing. *See id.* This case, however, is about investigation and supervision of foster homes, not about predeprivation notice and a hearing. In effect, the majority holds that the plaintiff has a legitimate claim of entitlement to investigation and supervision of her foster home, but that the state can deprive her of those rights after providing notice and a hearing.[23]

Further, the majority creates a remedies problem: the remedy for a procedural due process violation is restoration of the status quo ante and an injunction barring deprivation of the plaintiff's rights without the requisite procedural protections. *See Mathews v. Eldridge,* 424 U.S. 319, 349, 96

S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) ("All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case.") (citation omitted). The plaintiff does not seek this type of remedy, and it would not make sense for her to do so, because predeprivation notice and a hearing would not provide the money damages she seeks for the injury her foster parents inflicted.

## IV.

For the reasons I have set forth, I respectfully dissent from the majority's disposition of counts I and II of the complaint in this case. I concur in the majority's adoption of the panel's disposition of count III.

## APPENDIX

### COMPLAINT

NOW COMES the Plaintiff, KATHY JO TAYLOR, a minor, ("Plaintiff"), by and through David S. Walker, Jr., Attorney at Law, as Guardian Ad Litem, and her attorneys, Don C. Keenan and Keenan & Associates, P.C., and files this Complaint against the Defendants, JAMES G. LEDBETTER, Ph.D., PATRICIA JOHNSON, Ph.D., FREDERICK B. WEBB, SONYONNA STONE DANIELLE, JO ANN HOOVER, and W.R. BERRY, in their individual and official capacities, and hereby respectfully shows the Court as follows:

1.

The Plaintiff Kathy Jo Taylor is a citizen of the State of Georgia, and is physically located in a skilled nursing area at the Georgia Retardation Center in Atlanta, Georgia.

---

**23.** Of course, the majority also holds that the plaintiff has a *Doe* claim for violation of her substantive due process rights. That claim, however, is analytically distinct from the *Roth* claim.

2.

The Defendant James G. Ledbetter, Ph.D., is a citizen of the State of Georgia and the Commissioner of the State of Georgia Department of Human Resources, which is an agency of the government of the State of Georgia. Service of Process may be had by service of this Complaint at 47 Trinity Avenue, S.W., Atlanta, Georgia.

3.

The Defendant Patricia Johnson, Ph.D., is a resident of the State of Georgia and the Director of the State of Georgia Department of Human Resources' Division of Family and Children's Services. Service of Process may be had by the service of this Complaint at 47 Trinity Avenue, S.W., Atlanta, Georgia.

4.

The Defendant Frederick B. Webb is a citizen of the State of Georgia and the Director of the Gwinnett County Department of Family and Children's Services, which is a local sub-division of the Georgia Department of Human Resources. Service of Process may be had by service of this Complaint at 189 Chestnut Street, Lawrenceville, Georgia.

5.

The Defendant Sonyonna Stone Danielle is a citizen of the State of Georgia and is an employee of and supervisor of placement services for the Gwinnett County Department of Family and Children's Services. Service of Process may be had by service of this Complaint at 189 Chestnut Street, Lawrenceville, Georgia.

6.

The Defendant Jo Ann Hoover is a citizen of the State of Georgia and an employee of the Gwinnett County Department of Family and Children's Services. Service of Process may be had by service of this Complaint at 189 Chestnut Street, Lawrenceville, Georgia.

7.

The Defendant W.R. Berry is a citizen of the State of Georgia and an employee of the Gwinnett County Department of Family and Children's Services. Service of Process may be had by service of this Complaint at 189 Chestnut Street, Lawrenceville, Georgia.

8.

Jurisdiction is conferred upon this Court by virtue of 28 U.S.C. §§ 1331, 1343, in that this action is authorized by 42 U.S.C. § 1983 and the Constitution of the United States to redress deprivations of constitutionally protected rights and interests under color of state law. The amount in controversy exceeds $10,000.00, exclusive of costs and interest.

9.

The Plaintiff is a Minor, born on February 3, 1980, and brings this action by and through David S. Walker, Jr., Attorney at Law, as her Guardian Ad Litem; be [sic] being lawfully appointed to such capacity by order of the Gwinnett County Juvenile Court on January 6, 1984.

10.

*The custody, supervision, and care of the Plaintiff and her sister, Jodi Taylor, was given to the Gwinnett County Department of Family and Children's Services ("DEFACS") by lawful Order of the Gwinnett County Juvenile Court on or about May 5, 1982.*

11.

The named Defendants, at all times relevant hereto, by operation of the said lawful Order and of state law, had responsibility for the custody, supervision, and care of the Plaintiff.

12.

*The Defendants James G. Ledbetter, Ph.D., and Patricia Johnson, Ph.D., by virtue of their positions of authority and trust, and by operation of state law, had the ministerial duty to administer and*

supervise the local administration of state laws, rules, and regulations relating to public child welfare and youth services, and such duty included the duty to inspect at regular intervals all foster family homes used by authorized state agencies. The Defendants were grossly negligent in and deliberately indifferent to the discharge of this ministerial duty.

13.

The Defendants Frederick B. Webb, Sonyonna Stone Danielle, Jo Ann Hoover, and W.R. Berry, by virtue of their positions of authority and trust, and by operation of state law, had the duty, in placing the Plaintiff in foster family homes, to promote, safeguard, and protect the well-being and general welfare of the Plaintiff, by thoroughly investigating each such home and the character and reputation of the persons residing therein and by adequately supervising each such home during the period of care. The Defendants were grossly negligent in and deliberately indifferent to the discharge of this ministerial duty.

14.

As a direct and proximate result of the gross and culpable misfeasance, malfeasance, and nonfeasance of the Defendants, the Plaintiff has suffered grievous personal injuries and is in a comatose and vegetative condition and is without hope of recovery as it has been determined to a medical certainty that said condition is permanent and terminal.

15.

As a direct and proximate result of the gross and culpable misfeasance, malfeasance, and nonfeasance of the Defendants, the Plaintiff has been deprived, by state action, under color of state law, and without due process of law, of certain of her fundamental rights.

16.

The Defendant Jo Ann Hoover, an employee of DEFACS and the representative of DEFACS present when the Gwinnett County Juvenile Court placed the custody, supervision, and care of the Plaintiff and her sister in DEFACS, was informed by members of Plaintiff's natural family, including but not limited to her mother, Debra Trefren, her grandmother, Mary Blanche Collins, and her uncle, Dennis Collins, on or about May 5, 1982, that the Plaintiff's natural aunt and blood relative, Brenda J. Dyer, and her husband, James T. Dyer, were desirous of having custody of the Plaintiff and her sister placed in them.

17.

Brenda J. and James T. Dyer were legally and morally fit individuals to be entrusted with the custody, supervision, and care of the Plaintiff and her sister, and such fact was known to or should have been known to the Defendant Jo Ann Hoover in the exercise of even slight care, and, through her, to the other Defendants.

18.

The Defendant Jo Ann Hoover arbitrarily, maliciously, in bad faith, in reckless disregard of and deliberate indifference to the best interests of the Plaintiff and her sister, and in a grossly negligent manner failed to explore the possibility of having custody of the Plaintiff and her sister placed with Brenda J. and James T. Dyer, or to even forward to her superiors or otherwise report the information that they were desirous of having such custody placed in them; such failure being in violation of state law, rules and regulations.

19.

The Defendant W.R. Berry, an employee of DEFACS and the caseworker to whom the Plaintiff and her sister were assigned, was grossly negligent and deliberately indifferent in failing to independently investigate whether any members of the Plaintiff's natural family were legally and morally fit individuals to be entrusted with the custody, supervision, and care of the Plaintiff and her sister and were desirous of having such custody

*placed in them;* such failure being in violation of state law, rules and regulations.

### 20.

The Defendant Sonyonna Stone Danielle, an employee of DEFACS and the supervisor of placement services, was grossly negligent and deliberately indifferent in the discharge of the ministerial and supervisory duties of her office as relating to the custody, supervision, and care of the Plaintiff, and as established by state law, rules and regulations.

### 21.

The Defendant Frederick B. Webb, the Director of DEFACS, was grossly negligent and deliberately indifferent in the discharge of the ministerial and supervisory duties of his office as relating to the custody, supervision, and care of the Plaintiff, and as established by state law, rules and regulations.

### 22.

*The Defendants above-named in Paragraphs 18–21* were grossly negligent and deliberately indifferent *in failing to acquire or procure complete physical and medical data concerning the Plaintiff and to provide same to the foster parents to whom the custody, supervision, and care of the Plaintiff was given;* such failures being in violation of state rules and regulations.

### 23.

*The Defendants above-named in Paragraphs 18–21* were grossly negligent and deliberately indifferent *in failing to make a thorough and complete investigation and study of the foster home of Linda Price Lathren and Roy Michael Lathren (referred to hereinafter as "foster mother", "foster father", or collectively as "foster parents") prior to the Plaintiff being placed therein on or about August 12, 1982;* such failures being in violation of state rules and regulations.

### 24.

*The Defendants above-named in Paragraphs 18–21* were grossly negligent and deliberately indifferent in failing to properly maintain supervision of the foster home of the foster parents subsequent to the Plaintiff being placed therein; such failures being in violation of state rules and regulations.

### 25.

*The Defendants James G. Ledbetter, Ph.D., and Patricia Johnson, Ph.D., were grossly negligent and deliberately indifferent in failing to properly administer and supervise the local administration, by the Defendants above-named in Paragraphs 18–21, of the relevant state laws, rules, and regulations, and in failing to inspect at regular intervals the foster home of the foster parents;* such failures being in violation of state law.

### 26.

*The Plaintiff, together with her sister, was placed in the foster home of the foster parents on or about August 12, 1982.*

### 27.

*The foster parents were legally and morally unfit to be entrusted with the custody, supervision, and care of the Plaintiff and such fact was known to the Defendants or should have been known to them in the exercise of even slight care.*

### 28.

*The Plaintiff, on or about October 13, 1982, was wantonly and willfully struck, shaken, thrown down, beaten, and otherwise severely abused by the foster mother, and suffered severe and grievous personal injuries as a direct and proximate result thereof.*

### 29.

*The foster parents wantonly and willfully failed to seek emergency medical treatment for the Plaintiff until October 17, 1982, when she suffered seizures and lapsed into a coma.*

**30.**

As a direct and proximate result of the above, the Plaintiff has been deprived, by state action, under color of state law, and without due process of law, of the use of her mind and body, of her health, of the enjoyment of life, and, ultimately, of life itself.

**31.**

In particular, the arbitrary, grossly negligent, and deliberately indifferent acts and omissions of the Defendants, in utterly failing to comply with the mandatory, ministerial and supervisory statutory and regulatory duties specifically designed to promote, safeguard, and protect the well-being and general welfare of the children of this State, including the Plaintiff, have directly and proximately resulted in the Plaintiff being unlawfully deprived of the use of her mind and body, of her health, of the enjoyment of life, and, ultimately, of life itself.

**32.**

As a direct and proximate result of the above, Plaintiff:

(a) suffered severe injury;

(b) suffered permanent disability;

(c) lost future income potential;

(d) suffered severe pain and suffering; and

(e) incurred and will continue to incur substantial medical expense.

## COUNT ONE—DUE PROCESS OF LAW AS PROVIDED BY STATE LAW, RULES AND REGULATIONS

**33.**

Paragraphs 1 through 32 are herein realleged as if more fully set out below.

**34.**

The acts and omissions of the Defendants have deprived the Plaintiff of liberty without due process of law in contravention of the Fourteenth Amendment of the United States Constitution as a result of the failure of the Defendants to keep the Plaintiff free from harm by placing the Plaintiff in an unsuitable foster home and subjecting her therein to severe physical harm; said acts and omissions being in violation of state law, rules and regulations providing certain benefits and entitlements to the Plaintiff.

## COUNT TWO—CRUEL AND UNUSUAL PUNISHMENT

**35.**

Paragraphs 1 through 32 are herein realleged as if more fully set out below.

**36.**

The acts and omissions of the Defendants have denied the Plaintiff of her right to be free from cruel and unusual punishment in contravention of the Eighth and Fourteenth Amendments to the United States Constitution as a result of the Defendants directly and proximately inflicting harsh and brutal punishment upon the Plaintiff, failing to adequately investigate and supervise the foster home wherein the Plaintiff was placed, and otherwise depriving the Plaintiff of the care, protection and benefits to which she was entitled under state and federal law, rules and regulations.

## COUNT THREE—DUE PROCESS OF LAW AS PROVIDED BY FEDERAL LAW, RULES AND REGULATIONS

**37.**

Paragraphs 1 through 32 are herein realleged as if more fully set out below.

**38.**

The requirements of 42 U.S.C. § 601 *et seq.*, and 45 C.F.R. § 233 *et seq.*, are applicable to the foster placement of the Plaintiff in that it was financed in part, directly or indirectly, by funds provided by the United States Department of Health and Human Services.

**39.**

The Defendants are subject to the requirements of 42 U.S.C. § 601 *et seq.*, and 45 C.F.R. § 233 *et seq.*

**40.**

The Defendants have denied the Plaintiff of her rights, benefits and entitlements as guaranteed by 42 U.S.C. § 601 *et seq.*, and 45 C.F.R. § 233 *et seq.*, and thereby deprived her of liberty without due process of law in contravention of the Fourteenth Amendment of the United States Constitution.

WHEREFORE, Plaintiff respectfully prays, requests and demands this Honorable Court as follows:

(a) that process issue in terms provided by law and that Defendants be served according to law;

(b) that a jury trial be held;

(c) that Plaintiff have judgment against Defendants, jointly and severally, for all special, general and compensatory damages recoverable by law in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) or such other amount as a jury may determine to be just and proper;

(d) that Plaintiff have judgment against Defendants, jointly and severally, for all punitive and exemplary damages recoverable by law in the amount of FOUR MILLION DOLLARS ($4,000,-000.00) or such other amount as a jury may determine to be just and proper;

(e) that the costs of this litigation, including reasonable attorney's fees, as provided by 42 U.S.C. § 1988, be assessed against Defendants; and

(f) that Plaintiff receive all other relief which this Court may determine to be just and proper.

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Hatchett's opinion for the majority, except his resolution of the procedural due process claim based on *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). I agree with Judge Hatchett that the Georgia statutory scheme creates a liberty interest which would be protected by procedural due process. However, I conclude that plaintiff has not stated a viable proce-

dural due process claim. Plaintiff's brief to the en banc court makes it clear that plaintiff is pursuing a *substantive* due process claim (which the majority opinion, following *Doe v. New York City Dept. of Social Services*, 649 F.2d 134 (2d Cir.1981), finds to be viable in this case), and that plaintiff is *not* pursuing a *procedural* due process claim. In any event, for the reasons expressed by Judge Tjoflat in the last two paragraphs of Part III of his opinion, a predeprivation denial of procedural due process makes no sense in the context of this case. Any procedural due process claim based on a post-deprivation denial of due process would fail for failure to establish the inadequacy of Georgia's general tort remedies. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Rittenhouse v. DeKalb County*, 764 F.2d 1451 (11th Cir.1985).